William Curtis CATES, Appellant,

v.

The STATE of Texas, Appellee.

No. 05-86-01149-CR.

Court of Appeals of Texas, Dallas.

Nov. 21, 1989.

Rehearing Denied Jan. 3, 1990.

Molly Meredith LeNoir, Dallas, for appellant.

Anne Adair, Dallas, for appellee.

Before STEWART, BAKER and BURNETT, JJ.

## ON REMAND FROM COURT OF CRIMINAL APPEALS

STEWART, Justice.

William Curtis Cates was convicted by a jury of knowingly or intentionally causing bodily injury to a child in violation of section 22.04 of the Texas Penal Code. TEX. PENAL CODE ANN. § 22.04 (Vernon 1989). At appellant's election, the trial court assessed punishment, sentencing him to ten years' confinement in the Texas Department of Corrections and a $2,000 fine. In a published opinion, this Court affirmed the trial court's judgment, finding no merit in appellant's two points of error regarding sufficiency of the evidence to support a conviction and regarding the admissibility of testimony by a Department of Human Resources (DHR) investigator which detailed an oral confession made by the appellant. *See Cates v. State,* 748 S.W.2d 9 (Tex.App.—Dallas, 1987). The Court of Criminal Appeals found in its discretionary review that this Court was incorrect in its determination that appellant's oral confession was not a product of "custodial inter-

rogation" and held that the prophylactic warnings enunciated in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were, in fact, necessary to make such a confession admissible against the appellant. 776 S.W.2d 170. Consequently, this Court has been instructed to conduct a harm analysis as to the effect of the DHR investigator's testimony pursuant to rule 81(b)(2) of the Texas Rules of Appellate Procedure.[1] After reviewing the record, we reverse appellant's conviction and remand this cause to the trial court for further proceedings in accordance with this opinion.

In its recent opinion in *Harris v. State,* No. 69,366, slip op. at 29 (Tex.Crim.App. June 28, 1989), the Court of Criminal Appeals noted that, although Rule 81(b)(2) had been cited by that court innumerable times, the court had failed to articulate a coherent standard for determining when an error is harmless. After a lengthy consideration of the harmless error rule, its historical background, and the often inconsistent standard used by courts in conducting a harm analysis, the court set forth the following procedure for determining whether an error is harmless or not: "...[F]irst, isolate the error and all its effects ...; and second, ask whether a rational trier of fact might have reached a different result if the error and its effects had not resulted." *Id.* at 36–37. Prior to establishing this skeletal procedure, the court also enumerated general considerations for the reviewing court to be aware of when applying the harmless error rule, and emphasized that "it is the effect of the error and not the other evidence that must dictate the reviewing court's judgment." *Id.* at 36. In other words, even if the evidence of guilt is overwhelming, the conviction is tainted if the error was of a magnitude that it disrupted the jury's orderly evaluation of the evidence. Therefore, a court must examine not only the source and nature of the error, but also to what extent it was emphasized by the State

---

1. Rule 81(b)(2) states: "Criminal Cases. If the appellate record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment." TEX.R. APP.P. 81(b)(2).

and how much weight a juror would probably have placed upon the error. With these guidelines in mind, we consider the record before us.

The first witness at trial was Joanna Vatsis, a DHR investigator who was assigned to look into an anonymous referral taken on February 25, 1986, in which the caller expressed concern for a three or four-year-old child with bruises on her face. Two days later, Vatsis visited the child's residence, a motel on Harry Hines Boulevard, at about 11 a.m. A woman, who later identified herself as Janette Cates or Janette Olsen, answered the door and let Vatsis in. Also immediately visible in the room were the appellant and a very young baby. Vatsis asked about the three or four-year-old child, and the child was brought out from an unidentified back area. The child (hereinafter referred to as the complainant), was a little girl wearing only underpants, and Vatsis could see that she had dark bruising on her forehead and legs, and she was walking with a limp. Vatsis immediately told the appellant and the woman, who was the child's mother, that she needed to speak with them at her office and asked the mother to bring the baby and ride with Vatsis and the complainant, while appellant followed in his own vehicle. Vatsis then dressed the complainant, who appeared to be in a great deal of pain. At that time, Vatsis noticed that the complainant also had bruises on her arms, that the tops of her hands were swollen, and that she had cuts between her fingers. Before leaving the motel, Vatsis gave appellant her business card and directions to the office where she was transporting the rest of the family.

After arriving at the office, Vatsis interviewed the complainant alone, asking her who had done that to her. The complainant replied that her daddy had done that to her and that her daddy beat her legs. Upon further questioning, Vatsis determined that the "daddy" complainant was referring to was the appellant. Following this brief interview, Vatsis, who was concerned about the complainant's physical condition, called an ambulance and rode with the complainant to a nearby hospital.

Vatsis spoke with the complainant again at the hospital, and complainant told her that her daddy had hit her legs with a belt and made them bleed, that he had hit her in the mouth, and that her daddy would not let her eat. While police investigators were talking to the mother, both the complainant and the baby were examined and x-rayed at the hospital. The baby was uninjured. Afterwards, Vatsis informed the mother that she would be filing for custody of the children. Vatsis then transported the children to an emergency shelter, where photographs were taken of the complainant's injuries. The mother asked Vatsis for a ride, and Vatsis drove her back to the motel. The appellant never appeared at the office where Vatsis had directed him to go.

During her testimony, Vatsis identified a number of photographs depicting the bruising and other injuries suffered by the complainant as a result of the incident which was the basis for the criminal proceeding. Vatsis testified that the complainant looked physically worse than any other child she had worked with during her years as a social worker.

While cross-examining Vatsis, appellant's counsel elicited the initial testimony regarding Vatsis's conversation with the appellant at the Dallas County jail. Vatsis acknowledged that she spoke with appellant about a variety of subjects, including the appellant's desire to obtain therapy or counseling.

Next to testify was Dr. Paul Prescott. Dr. Prescott, who specializes in pediatrics and child abuse and neglect, examined the complainant on the day Vatsis removed her from the motel. At that time, the doctor observed extensive external injuries on the body of the complainant, with extended areas of bruising, basically from head to toe. Of the approximately one thousand children whom Dr. Prescott examines yearly, only one or two suffer from the extensive visible trauma exhibited by the complainant. Specifically, Dr. Prescott's medical checkup of the complainant revealed four or five areas of hair loss on her head where hair had obviously been pulled out, bruising on her left ear and forehead, and a

swollen and cut upper lip, as well as loosened and bloody upper teeth. There were multiple bruises on the complainant's back, chest and abdominal areas, and her entire buttocks area and the back and sides of her thighs were bruised. The bruising was very purple, hard, and tender to the touch, indicating that it was caused by multiple blows. The complainant had an abrasion on one of her legs which was characteristic of a belt mark, and there were several large areas of friction burns on her buttocks. Her left hand was very bruised on the front surface, again with distinctive belt marks, and she suffered from a deep purple triangular-shaped bruise to her genital region that was characteristic of a boot or shoe print left by a forceful and direct kick to that area.

During his testimony, Dr. Prescott identified many of the above-described injuries by using photographs taken of the complainant. On cross-examination, the doctor admitted that he did not know what specifically caused the complainant's injuries, but that, aside from a physical beating, they could only have occurred as the result of a severe accident such as a car wreck or a fall from a third-story balcony.

Following Dr. Prescott's testimony, the complainant, who had already been found competent to testify by the trial court judge, was called to the stand. However, she refused to speak in front of the jury and did not serve as a witness at that time.

Officer Paul Ronyak of the Dallas Police Department's Child Abuse Unit took the stand to detail his investigation of the alleged abuse of the complainant. Ronyak and his partner, Floyd Perry, responded to a call concerning the complainant on the same day she was removed from the motel. The officers went to the hospital where the complainant had been taken, and Ronyak interviewed the complainant, while Perry talked with her mother. At that time, the complainant was very upset, crying, and badly bruised from head to toe. After talking with the complainant and her mother, Ronyak and Perry went to the motel on Harry Hines Boulevard in an effort to locate the appellant. Finding the appellant's

motel room vacant, the two officers spoke with the motel's manager who directed them to appellant's place of employment, a nearby bowling alley. When the officers arrived at the bowling alley, they found a car which matched the description of the type of vehicle which the appellant was driving. The car was fully packed with boxes, suitcases and clothing. Shortly after the officers located the car, the appellant walked out of the building. The officers stopped the appellant, advised him of his rights, and transported him to their office to be interviewed. Officer Ronyak testified that during the interview the appellant appeared to be nonchalant and acted as though he had done nothing wrong.

Following another unsuccessful attempt to allow the complainant to testify, the State recalled Joanna Vatsis as a witness. At that time, Vatsis went into detail regarding the conversation she had with the appellant several days after he was arrested in connection with the complainant's injuries. The purpose of Vatsis's visit, which took place at the Dallas County jail, was to gather routine information on family background and to validate allegations of abuse or neglect. According to Vatsis, appellant said, "I beat her. I'm not going to tell you I didn't beat her. I took my belt off, and I can't—I don't remember what happened after that. I can't tell you what happened after that." Appellant also told Vatsis that at one point he felt like his father because, as his father had done to him (appellant), he "beat and beat and beat" the complainant, and didn't stop. Appellant further admitted that there had been times when he and the complainant's mother would eat in front of the complainant but would refuse to allow her to eat as well. Appellant also stated that on the night that he beat the complainant, he had arrived home from work at about 2:00 a.m. and, after being told that she had refused to behave while he was away, got the complainant out of bed and began "disciplining" her. The appellant told Vatsis that it was a blessing that she had arrived at the motel when she did or the complainant would have been dead. He explained that he had not followed Vatsis and his family to the shelter

that day because he knew he was going to jail.

Upon cross-examination, Vatsis acknowledged that the appellant did not have a lawyer present during her conversation with him and that she did not advise him of his *Miranda* rights. Vatsis did inform the appellant that he did not have to speak to her and that she was there because of the injuries to the complainant. She explained to the appellant about a plan she was attempting to implement with the complainant's mother so that the mother might be able to regain custody of her children, but that such a plan would be more difficult in the appellant's case since he was in jail. During their conversation, the appellant cried, seemed extremely remorseful, and told Vatsis that he had only intended to discipline the complainant. Appellant also told Vatsis that he had been abused as a child.

In final arguments, both the defense and the State concentrated much of their persuasive efforts on whether the appellant did, in fact, knowingly and intentionally cause bodily harm to the complainant. The defense argued that there was not enough evidence to link the appellant to all of the complainant's injuries, and, with regard to the injuries he may have caused, he inflicted them upon the complainant recklessly, and not knowingly and intentionally. To combat the argument that the appellant caused harm to the complainant recklessly rather than knowingly and intentionally, the State emphasized his confession to Vatsis that he "beat and beat and beat" the complainant, and also his statement to her that it was a blessing she had arrived when she did or the complainant would have been dead. The State further buttressed its position by arguing that appellant's statement to Vatsis, that he did not show up at the shelter where she had directed him to go because he knew he was going to jail, was clear evidence that he was aware that the force he had used against the complainant was not reasonable discipline.

Based on the entire record before us, we conclude that the erroneous admission of Vatsis' testimony relating her conversation with the appellant compels reversal of this case. Her testimony was the only direct evidence regarding appellant's intent when he beat complainant. Although there was overwhelming evidence presented earlier in the trial that appellant had beaten the complainant and caused most, if not all, of her injuries, appellant's state of mind during the beating was a crucial element of the offense for which he was on trial, and this element was a vehemently contested issue during final arguments. The erroneous admission of the oral confession allowed the State to argue its contents in an attempt to convince the jury that appellant had acted knowingly and intentionally. Because there was no other direct evidence on appellant's state of mind, we conclude that the jury probably placed great weight on appellant's statements to Vatsis in determining whether appellant knowingly and intentionally injured complainant and, therefore, that the error at issue probably prejudiced the jurors' decision-making. *Harris,* at ——. For these reasons we hold that a rational trier of fact might have reached a different result if the error at issue and its effects had not resulted. Accordingly, we hold that the error before us was harmful. We reverse and remand this cause to the trial court for further proceedings consistent with this opinion.